THE ILLINOIS STARCH COMPANY

*v.*

THE OTTAWA HYDRAULIC COMPANY.

*Filed at Ottawa June 16, 1888.*

1. LEASE—*duration of term—a lease construed, in connection with a prior lease.* The trustees of the Illinois and Michigan Canal leased to a hydraulic company certain land and water power, for twenty years, with the right to renew the lease in periods of twenty years each, on the same terms, or at such higher terms as might be offered by the highest responsible bidder. The hydraulic company leased the water power and premises to a starch company for nine hundred and ninety-nine years, which latter company, in and by its lease, covenanted to pay rent quarterly, and to keep and perform all the covenants of its lessor to the canal board, and such lease contained a clause that "it is understood and agreed between the parties, that all the conditions, limitations and restrictions contained in the lease of the trustees * * * to the hydraulic company, bearing date * * * are to apply to and constitute a part of this lease, and that the starch company, its lessees and assigns, are to be governed, limited and restricted by them," etc.: *Held,* that the two leases were to be taken and construed together, and that it was not intended that the leasehold interest granted by the second lease was for nine hundred and ninety-nine years absolutely,

but for that term in the event the first leasehold interest was not terminated prior to the expiration of that period.

2. STRICT FORECLOSURE—*whether allowable.* As a general rule, a strict foreclosure of a mortgage or other lien will not be permitted where there are other creditors, or other incumbrances upon the property, or purchasers of the equity of redemption; but there are exceptions to such rule.

3. A starch company leased certain premises and water power at a certain rental per annum, payable quarterly, and the lease made its covenants to pay, etc., a lien on the demised premises and improvements thereon. The company allowed the improvements to run down and become almost valueless, ceased to occupy and use the premises, failed to pay any rent or interest thereon for several years, and suffered its equity of redemption to be sold; and it appeared that the property was of considerably less value than the rent due, as found in the decree, and was liable to destruction from fire: *Held,* that a decree of strict foreclosure, in default of payment within one hundred days, was proper, under the peculiar circumstances of the case.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of La Salle county; the Hon. GEO. W. STIPP, Judge, presiding.

Mr. JOHN DEAN CATON, and Messrs. BULL, STRAWN & RUGER, for the plaintiff in error.

Mr. H. T. GILBERT, and Mr. LORENZO LELAND, for the defendant in error.

Per CURIAM: This writ of error is prosecuted to the Appellate Court for the Second District, to reverse the judgment of that court affirming the decree of strict foreclosure rendered by the circuit court of La Salle county. We have carefully considered the record, and the several errors assigned thereon, and are of opinion that there was no error in rendering said decree. We concur both in the presentation of fact and the application of principles by the Appellate Court, in its opinion by BAKER, J., and for the reasons there stated the judgment of the Appellate Court is affirmed. The opinion of the Appellate Court is as follows:

"The Illinois Starch Company was originally organized under the name of the Ottawa Starch Company, but afterwards its

name was changed to that which it now bears. The present bill was filed by the Ottawa Hydraulic Company, against the starch company, for the purpose of foreclosing for rents due and unpaid, under the mortgage clause contained in a lease executed by it to the starch company. The lease bore date on the 1st day of March, 1856, and the demised premises were a certain water power therein particularly described, and a tract of land on the west side of La Salle street, in Ottawa, (also described,) the water leased to be drawn from the hydraulic basin and used on said land. By the terms of the lease it was to continue and be in force for the period of nine hundred and ninety-nine years, with the privilege of renewing the same, and the lessee covenanted to pay, as rent, the sum of $2500 per annum, to be paid quarterly, in advance. The lease, among many other provisions, contained the following :

" 'It is further understood and agreed, that in case of a failure on the part of the party of the second part, or its assigns, to pay the said rent at the time when it shall become due, time being hereby made an essential part of this contract, or in case of a failure to comply with all the covenants and conditions herein, and also with all the covenants, conditions, limitations and restrictions contained in said lease from said canal trustees to said party of the first part, for the purpose of securing to the said parties of the first part prompt payment of the said rent, and the performance of the said covenants to be kept and performed by the said party of the second part, the said party of the first part shall have the right to declare this lease absolutely null and void, and so to consider; or the said party of the first part may, at its election, enforce the payment of said rent, and also for all damages for non-payment, and may also enforce compliance with the said lease from the said canal trustees, and with all the covenants in this lease, and may also, whether this lease shall be declared void or not, recover all damages for a breach of either of said leases by said party of the second part, or its assigns. It is further

understood and agreed that the rent therein covenanted to be paid by the said party of the second part, and also all of the covenants on the part of the said party of the second part herein contained, are to be a lien upon the said tract of land hereby leased, and all improvements thereon, or which may be put upon the same, which shall include machinery of every kind used upon the said premises.'

"The right of the Ottawa Hydraulic Company to the water power and land leased to the starch company, was obtained under a lease dated the 24th day of May, 1852, from the board of trustees of the Illinois and Michigan Canal to them. By the provisions of this latter lease, this right expired at the end of twenty years from the date of such lease, with a right to renew the lease in periods of twenty years each, on the same terms, or at such higher terms as might be offered by the highest responsible bidder. In pursuance of these stipulations of the lease, it was afterward renewed for a further term of twenty years, to expire in May, 1892.

"Upon the hearing, the circuit court found the allegations of the bill of the hydraulic company to be true; that there was due for rent, and for interest on installments of rent after due, the sum of $8964.41; that it was entitled to a first lien on the premises and machinery; that the Illinois Starch Company was insolvent, and an execution would be unavailing; that it owned no property aside from its interest in the machinery and premises in question; that they were not worth over $6000, and were insufficient to satisfy the amount due the hydraulic company, and that a sale would subject the latter to unnecessary charges and expenses. A decree was thereupon rendered for $8964.41, and for a strict foreclosure, and it was ordered that in default of payment of the decree within one hundred days from the entry thereof, the hydraulic company should be let into possession of the premises and improvements thereon.

"Upon this writ of error three objections are urged against the decree. It is insisted that the lease to the starch company purported to convey an absolute, unqualified and indefeasible leasehold estate for the period of nine hundred and ninety-nine years, whereas the hydraulic company had no absolute right for any such period, but its right and interest were subject to termination by the canal trustees if they could get better rent for the water at the end of any period of twenty years, and that as the starch company, on the strength of its lease, expended large sums of money in building and making improvements, it was error to render a decree for the rent claimed by the hydraulic company, without taking into consideration the fact that the starch company had been greatly damaged in the value of its expenditures by reason of the uncertain tenure of its water lease. There is no force in this point. The lease to the starch company expressly states that ˮit is understood and agreed between the parties that all the conditions, limitations and restrictions contained in the lease of the trustees of the Illinois and Michigan Canal to the hydraulic company, bearing date the 24th day of May, 1852, are to apply to and constitute part of this lease, and that the starch company, its lessees and assigns, are to be governed, limited and restricted by them,—the water and land hereby leased being part of the water and land leased by the trustees to the hydraulic company in and by this lease.' This provision in the contract shows that the two leases are to be taken and construed together, and that it was the understanding and agreement between the parties that the second leasehold interest was not for nine hundred and ninety-nine years absolutely, but for that term in the event the first leasehold interest was not terminated prior to the expiration of that period. Besides this, George H. Norris, who was president of the starch company, and executed the lease on its behalf, was at the same time a stockholder and director of the hydraulic company, and

as such had signed the agreement of May 24, 1852, between the canal trustees and the latter company. In fact, we find no evidence to prove the fraud that is alleged and stated in the answer of plaintiff in error.

"In the second place, it is claimed that the evidence does not show the value of the property was less than the rent due. Four witnesses were examined at the hearing, on behalf of the hydraulic company, all of whom stated that they were well acquainted with the property. Lorenzo Leland testified that all of the buildings and machinery, together, were worth less than one-half the debt. H. J. Logan testified that he was a millwright, and acquainted with buildings and machinery for manufacturing purposes, and had experience in judging of their value; that he had recently examined the buildings and machinery in question, and the whole were worth, in all, not to exceed $5000. M. A. Cushing testified that the whole thing would not be worth over $5000 for any purpose. William Thomas testified that the expense of remodeling the building so as to adapt it for any practical purpose, would be greater than to build a new building for the same purpose, and that the expense of tearing it down would be greater than the value of the materials after it was torn down.

"Three witnesses were examined for the starch company. Charles A. Caton testified that the building and machinery had last been used, for a few months, in the winter of 1881-82, and that since that time the Sanders Bros. had been employed, at an expense of $2500, to make repairs. He also made statements showing that prior to the time mentioned large sums of money had been expended upon the premises. He further said that he would not undertake to state what the building was now worth, or make any statement of its present value. William and Frank Sanders each declined to say what the building was now worth, but stated that it probably cost $50,000 or $60,000, and had depreciated at least seventy-five per cent.

"Without going further into the details of the testimony, we may observe, that it conclusively shows that both the building and the machinery originally cost a great deal of money, and that years ago considerable sums were expended in making repairs, and that now they are both in a very dilapidated condition. The statements of the witnesses Sanders, that the building had depreciated in value *at least* seventy-five per cent, are not equivalent to statements that in their judgment the building was now worth the twenty-five per cent of the original cost, as seems to be supposed by counsel. In fact, they refused to place a value upon it. In our opinion, the evidence would not have justified the court in assuming a higher valuation for the property than it did.

"The third and principal ground relied upon for a reversal of the decree, is the claim that it was error to award a strict foreclosure of the mortgage clause of the lease, because it appeared, from the evidence, there was a judgment creditor of the Illinois Starch Company, who was also a purchaser, at sheriff's sale, of its equity of redemption in the premises. We do not understand the rule in this State to be, that a strict foreclosure will in no case, and under no circumstances, be allowed where there are other creditors, or other incumbrances upon the mortgaged property, or purchasers of the equity of redemption. It is undoubtedly true that the general rule is, that a strict foreclosure will not be permitted where there is such creditor, purchaser or incumbrance; but, in our view, there are exceptions to this general rule.

"The authorities relied on by plaintiff in error are *Farrell* v. *Parlier*, 50 Ill. 275, and *Boyer* v. *Boyer*, 89 id. 447. In the first mentioned case, the Supreme Court said: 'In our State, and in view of our statute, it is only in strong cases, which form exceptions, that there should be decreed strict foreclosure. It may be, in rare cases, where it appears the property is of less value than the debt for which it was mortgaged, and the mortgagor is insolvent, and the mortgagee is willing to take

the property in discharge of his debt, that a strict foreclosure may be allowed. But it is not, as a general rule, proper, when there are other incumbrances upon the property, or creditors, or purchasers of the equity of redemption. The statute allowing redemption, in such cases intends to make the property pay as much of the mortgagor's debt as it is worth.'

"Why was it said by the court that in any of the cases enumerated a strict foreclosure 'is not, as a general rule, proper?' Why did they not say that in such cases such foreclosure is not proper? Why did they not omit the words, 'as a general rule?' We think the answer is obvious, and that it is plain they used those words as a qualifying clause, for the purpose of qualifying the inflexible rule that would have been announced by the language of the court with the words in question omitted. A statement that a thing is 'thus, as a general rule,' *ex vi termini* imports there are exceptions to the rule enunciated.

"*Boyer* v. *Boyer* merely reiterates the doctrine announced and language employed in *Farrell* v. *Parlier*, and otherwise there is nothing in the case that throws light upon the present inquiry.

"Assuming, then, that there are, or may be, exceptional cases that do not fall within the rule which prohibits a strict foreclosure where there are other incumbrances, or creditors, or purchasers of the equity of redemption, the question arises whether the suit at bar is such exceptional case. The evidence shows that John D. Caton recovered a judgment for $281,155.83, against the Illinois Starch Company, and that since this suit was begun, the property in controversy was sold on an execution issued on said judgment, for $40,000, to Thomas D. Catlin, the business agent at Ottawa, of Judge Caton. The evidence also shows that the plaintiff in error is wholly insolvent, and has no property of any kind besides that in respect to which its equity of redemption was foreclosed by the decree herein.

"It is important to bear in mind, that by the terms of its contract, the Ottawa Hydraulic Company not only had a first

lien upon the property, but a right to declare a forfeiture on the 1st day of January, 1883, and every three months thereafter, and had it chosen to execute such right, it might, time and again, have entirely extinguished all claims of the Illinois Starch Company and its creditors in or to such property. Instead of enforcing the harsh and effectual remedy it held within its own grasp, and cutting off speedily and forthwith all right and interest of both plaintiff in error and its creditors, it sought relief in the court of equity, thereby expressing its willingness to waive the numerous acts of forfeiture, to give its debtor a day in court, and further and full opportunity to settle the just debt due it, and even the extension of the time of payment for a period of one hundred days beyond the day of the entry of a decree of foreclosure.   The evidence in this case shows that the property affords but scant payment to defendant in error for its debt, and that it is not reasonably possible that either the plaintiff in error or the other creditors could reap any benefit, even if the premises were sold with right of redemption.   Most of the machinery has been removed, and that which is left is worth just about what old iron would sell for.   The building is old, rotten and out of repair; the doors and windows are many of them gone, and the roof has in part fallen in.   The witnesses state these facts, and others of like effect, in regard to the present condition of the property, and they are not contradicted.   They also state that tramps and stragglers can enter and go all through it, and sleep there without molestation, and that it is in constant danger of being burned.

"It would, indeed, be fortunate if not only defendant in error but all the other creditors of the insolvent corporation could make their debts out of this property; but that can not be done. It is the intent of the law that the property of a mortgagor should pay as much of his indebtedness as it is worth, but the law does not presume it will pay more than it is worth.   It would seem no good or beneficial result would be accomplished

by keeping the hydraulic company out of possession fifteen months longer. The property is not worth its debts now, and is constantly deteriorating in value.

"This is not the case of an ordinary foreclosure of mortgage, where the amount due upon the preferred lien would increase only at the rate of six per cent per annum, but here, the preferred lien, at the end of fifteen months, will have increased not only to the extent of six per cent upon $8964.41, the amount of the decree, but in the further sum of $3125 for rents accrued in the interim, unless the inequitable doctrine should be held that defendant in error should lose all benefit of its water power and land during such interim.

"The premises have been used for no beneficial purpose since the winter of 1881-82, and if sale had been decreed, with right of redemption, they would have lain idle for fifteen months longer. In our opinion, the whole question lies in a nutshell. The court of equity will not, by a decree of strict foreclosure, sacrifice the just and equitable rights of creditors, or of those holding second liens, or the equity of redemption. Neither will the court of conscience sacrifice or endanger the rights of a complainant who comes within her portals with a just cause, and holding the oldest and preferred lien and best equity, for the bare possibility of a wholly improbable benefit to one having a second lien and subordinate equity. In this case, if sale and redemption were allowed by the decree, and no redemption made, all the loss occasioned by the further decay and destruction of the property would fall upon defendant in error. It would also lose all interest upon its decree, and $3125 in water rents, and would at the same time be compelled to pay rents upon the water power and property to the canal trustees.

"The building is exposed to great danger of destruction by fire, and in the event it were burned down during the fifteen months allowed for redemption, the loss would fall wholly upon the hydraulic company, and in that case, in addition to losing the water rents accruing after decree entered, it would

lose the money adjudged to it by the decree.   The rule that is intended to conserve the equities of the creditor, should not be used as a weapon to endanger or destroy the rights of the holder of the superior equity.

"We think the present case, owing to the altogether peculiar circumstances out of which it arises, and of the property, is one of the exceptional cases which the opinion in *Farrell* v. *Parlier* intimates does not fall within the rule there announced.

"The decree of strict foreclosure is affirmed."

*Decree affirmed.*